# EXHIBIT D

*Execution Version*

# SIXTH AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# MEDVET ASSOCIATES, LLC

## (An Ohio Limited Liability Company)

THE INTERESTS CREATED BY THIS AGREEMENT HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH THE SECURITIES AUTHORITIES OF ANY STATE UNDER ANY STATE SECURITIES LAWS.  AS A CONSEQUENCE, THE INTERESTS MAY NOT BE SOLD, ASSIGNED, CONVEYED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED BY A HOLDER THEREOF EXCEPT:  (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT REGISTERING THE INTERESTS UNDER THE SECURITIES ACT AND/OR UNDER APPLICABLE STATE SECURITIES LAWS, OR (2) PURSUANT TO SUCH OTHER EVIDENCE WHICH HAS BEEN OBTAINED BY THE HOLDER AND WHICH IS REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION UNDER THE SECURITIES ACT AND/OR UNDER APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED FOR SUCH HOLDER TO LAWFULLY EFFECT SUCH SUBSEQUENT SALE, ASSIGNMENT, CONVEYANCE, PLEDGE, HYPOTHECATION OR OTHER TRANSFER. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

"Class A Trigger Event" means any of (i) the consummation of, or the Company agreeing to enter into, a Change of Control transaction, (ii) the approval of the liquidation, dissolution or winding up of the Company pursuant to Section 6.2(a)(ii), (iii) the Company, any of its Subsidiaries or any of the Veterinary Practice Entities licensing, or agreeing to license, all or a majority of the Intellectual Property owned or purported to be owned by the Company, any of its Subsidiaries or any of the Veterinary Practice Entities to one or more Independent Third Parties, (iv) a Bankruptcy Event and (v) (x) a breach by the Company of any Specified Investor Provision or (y) a breach of Sections 1, 6 or 7 of the Investor Rights Letter Agreement, and, in each case, such breach is not cured within twenty (20) days after receipt by the Company of notice from the Specified Member of such breach; provided, that any of the foregoing events shall not be considered a Class A Trigger Event if the Preferred Members, by Preferred Member Approval, elect otherwise by written notice sent to the Company.

"Clients" means any Person that, directly or indirectly, through one or more intermediaries, owns or controls the medical decision-making for an animal that received veterinary care from the Company or any of its Affiliates.

"Code" means the Internal Revenue Code of 1986, as amended, from time to time, or any successor statute. Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision in any successor statute.

"Common Holder Approval" means, as of any given time, the approval of Common Holders having an Aggregate Common Interest of at least a majority of the Aggregate Common Interests of all Common Holders as of such time.

"Common Holders" means the Common Members.

"Common Members" means those Members of the Company, including any Entity Member, holding Common Units, in their capacities as such.

"Common Units" is defined in Section 2.8(a)(i).

"Company" is defined in the preamble to this Agreement.

"Company Equity Recapitalization" means the consummation of a transaction pursuant to which an Independent Third Party acquires more than 35% (determined by reference to voting as well as economic rights (i.e., Equity Securities entitled to more than 35% of the value of the assets or the proceeds that would be distributed to the Members in connection with a liquidation of the Company in accordance with this Agreement)) of the Company's outstanding Equity Securities immediately after such transaction on a fully diluted basis; provided, that, no such transaction shall be considered a Company Equity Recapitalization unless such transaction is consummated after July 15, 2024.

"Company Equity Securities" is defined in Section 7.1(a).

"Company Subsidiary Securities" means any Equity Securities of any Subsidiary of the Company.

"Company Trigger Event" means the consummation of any transaction by BSPI pursuant to which it purchases Equity Securities (i) having twenty-five percent (25%) or more of the ordinary voting power of or (ii) pursuant to which it otherwise controls any of (a) Pathway Vet Alliance or any of its controlled or controlling Affiliates, (b) Ethos Veterinary Health LLC or any of its controlled or controlling Affiliates, or (c) SAGE Veterinary Group, LLC or any of its controlled or controlling Affiliates (for the avoidance of doubt, excluding any transaction by the Company or any of its Subsidiaries in which BSPI is providing funding).

"Competing Business" means any Person engaged in the business of providing veterinary services similar in part or in whole to those provided by the Company or any of its Affiliates, including a veterinary business created, opened or developed by a Management Member.

"Confidential Information" shall include, without limitation, as created by the Company or its personnel, treatment forms, laboratory results, radiographs, phone logs, appointment books, telephone and address books, mailing lists, computer software programs and data, marketing information, manuals and training materials, financial planning, information about financial affairs, management or medical systems and procedures, new business development information or materials, price lists, pricing information, lists of potential customers compiled or purchased by the Company, the names or addresses of any past or present Clients or Referral Partners of the Company or any Client records, financial information, records, techniques, business secrets, trade secrets or any other information with respect to the Company's business that is not available generally in the veterinary field and that is not known or available on a non-confidential basis to competitors of the Company or other third parties unaffiliated with the Company or its Affiliates.

"Conflicting Terms" is defined in Section 10.2(c).

"Corporate Vehicle" is defined in Section 12.1.

"Covered Person" is defined in Section 3.7(c).

"Depreciation" means, for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such fiscal year, except that with respect to any other asset the Gross Asset Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such fiscal year. Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Taxable Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation with respect to such asset (if being determined under this proviso) shall be determined with reference to the beginning Gross Asset Value of such asset using any reasonable method selected by the Company.

"Director" is defined in Section 3.2(a).

"Distributable Assets" means all cash receipts (including from any operating, investing, and financing activities) and other assets of the Company from any and all sources, reduced by operating expenses, contributions of capital to Subsidiaries, investments and payments required

(e)    an issuance by the Company of Common Units to a Remaining Entity Owner following the exercise of the Repurchase Option by the Company with respect to any Entity Member under and in accordance with Article IX to any of those Persons maintaining their ownership interest in such Entity Member prior to the exercise of the Repurchase Option (each, a "Remaining Entity Owner") so long as such Common Units are issued at the applicable Repurchase Price and the aggregate number of Common Units issued to such Remaining Entity Owners does not exceed the aggregate number of Common Units indirectly held by such Remaining Entity Owners that were redeemed from the applicable Entity Member, through such Remaining Entity Owners' ownership interest in such Entity Member, prior to the exercise of the Repurchase Option.

"Employment Relationship" means a Management Member's employment with, or provision of services to, the Company or any of its Affiliates.

"Entity Member" means any Member holding Common Units (other than Common Units issued as a result of any Investor Warrants) who is not a natural person; provided, that, for purposes hereunder, in no event will any Person who is a Preferred Member, a holder of Investor Warrants or who holds Common Units issued as a result of any Investor Warrants (including the Broad Street Investor) be an Entity Member.

"Equity Securities" means (a) as to any Person that is a corporation, the shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, (b) as to any Person that is not a corporation or an individual, the ownership, beneficial or membership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise control over such Person and (c) as to any Person, (i) any securities of such Person, directly or indirectly, convertible into or exchangeable for any capital stock, voting, partnership, membership, joint venture or other ownership or equity interests, or other share capital (whether voting or non-voting, whether preferred, common or otherwise) of such Person or containing any profit participation features with respect to such Person, (ii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, voting, partnership, membership, joint venture or other ownership or equity interests, other share capital (whether voting or non-voting, whether preferred, common or otherwise) of such Person or securities containing any profit participation features with respect to such Person or directly or indirectly to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable for any capital stock, voting, partnership, membership, joint venture or other ownership interests, other share capital (whether voting or non-voting, whether preferred, common or otherwise) of such Person or securities containing any profit participation features with respect to such Person, or (iii) any share, unit or membership interest appreciation rights, phantom share rights, contingent interest or other similar rights relating to such Person.

"Equity Value" is defined in the definition of "Fair Market Value."

"Exercising Member" is defined in Section 8.4(b).

"Existing Agreement" is defined in the recitals to this Agreement.

-10-

"Fair Market Value" of any Equity Security (including the Units) means the fair value of such security as determined based on the fair market value of the entire equity of the issuer of such Equity Security as a going concern and the terms, rights and preferences of all Equity Securities of such issuer, without any discount for lack of liquidity or minority interest, and taking into account the assets, liabilities, earnings and prospects of the issuer and its Subsidiaries ("Equity Value"), as determined by the Board acting reasonably and in good faith; provided, that with respect to any determination of the Fair Market Value of any Unit or other Membership Interest, (i) such determination shall be made by determining the aggregate amount of Distributable Assets that the holder of such Unit or other Membership Interest would receive in respect of such Unit or other Membership Interest if the Company were to distribute an amount equal to its Equity Value to its Members in a distribution in accordance with Section 5.4(b) (assuming solely for purposes of this clause (i) that all Unvested Profit Units have vested) and (ii) if such Equity Value is being determined for purposes of clause (i) above substantially and concurrently in connection with a sale or investment transaction involving a purchaser of or an investor in the Company that is an Independent Third Party, the Equity Value shall be consistent with the implied valuation of the Company being used for such other sale or investment transaction.

"Final Interest FMV" is defined in Section 8.2(c)(iii).

"First Determination FMV" is defined in Section 8.2(c).

"Fund Indemnitees" is defined in Section 3.8(e).

"Fund Indemnitors" is defined in Section 3.8(e).

"GAAP" means United States generally accepted accounting principles as from time to time in effect.

"Geographic Area" is defined in Section 10.2(b)(ii).

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset on the date of the contribution, as determined by the contributing Member and the Company.

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board acting reasonably and in good faith, as of the following times:

(i)     the acquisition of an additional interest in the Company after the date hereof by a new or existing Member in exchange for more than a de minimis Capital Contribution, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Economic Interests of the Members in the Company;

-11-

"Investor Warrant" means those certain warrants to purchase Common Units issued on July 15, 2019 and those certain warrants to purchase Common Units issued pursuant to certain agreements entered into by the Company with certain Investor Warrant Holders on the Effective Date.

"Investor Warrant Purchase" is defined in Section 8.2(a).

"Investor Warrant Purchase Notice" is defined in Section 8.2(a).

"Liability" means any damage, judgment, fee, amount paid in settlement, fine, penalty, punitive damages, excise tax assessed with respect to any employee benefit plan, or cost or expense of any nature (including attorneys' fees and disbursements).

"Liquidity Notice" is defined in Section 8.3(a).

"Look-back Amount" is defined in Section 9.5.

"Management Member" means (i) each Common Member that is or was employed by the Company, Vetcorp or any of their respective Affiliates, (ii) each Person to whom Profit Units are granted by the Board, unless any such Person is otherwise determined by the Board to not be so classified and (iii) any other Common Member as determined by the Board to be so classified; provided, that, for purposes hereunder, in no event will any Person who is a Preferred Member, a holder of Investor Warrants or who holds Common Units issued as a result of any Investor Warrants (including the Broad Street Investor) be a Management Member.

"Member" means each Person listed on Schedule A as of the date hereof and each other Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Membership Interest" means, with respect to each Member, such Member's Economic Interest and other rights as a Member.

"Net Income" or "Net Loss" means for each fiscal year of the Company, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be subtracted from such taxable income or loss;

-14-

"Termination" means the termination of any Management Member's Employment Relationship for any reason (including death, disability or retirement) or no reason.

"Third Determination Interest FMV" is defined in Section 8.2(c)(iii).

"Transfer" means a transfer, sale, assignment, pledge, hypothecation or other disposition, whether directly or indirectly pursuant to the creation of a derivative security, the grant of an option or other right or the imposition of a restriction on disposition or voting, and irrespective of whether any of the foregoing are effected, with or without consideration, voluntarily or involuntarily, by operation of law or otherwise, or whether inter vivos or upon death (it being agreed that (i) any Transfer of Equity Securities in an entity that directly or indirectly holds Company Equity Securities (excluding publicly traded Equity Securities) shall be deemed to be a Transfer of the underlying Company Equity Securities and (ii) any Transfer of Equity Securities in an entity all or substantially all of the assets of which are Company Equity Securities shall be deemed to be a Transfer of the underlying Company Equity Securities).

"Units" means units of Membership Interests in the Company from time to time outstanding hereunder (which are initially represented by the Profit Units and the Capital Units).

"Unvested Profit Units" means, as of any time of determination, Profit Units that are not Vested Profit Units.

"Vested Profit Units" means, as of any time of determination, Profit Units that have vested as of or prior to such time in accordance with the terms of this Agreement or an Award Agreement.

"Vetcorp" means MedVet Associates, Inc., an Ohio corporation, that was dissolved on December 31, 2013.

"Veterinarian Service Provider" means, as of any relevant time, any director, officer, employee (whether temporary, part-time or full-time) or individual independent contractor of the Company, any of its Subsidiaries or any of the Veterinary Practice Entities, who is employed or engaged as a veterinary doctor.

"Veterinary Practice Entity" shall mean any Person (a) which provides professional veterinary services through a professional veterinary practice, veterinary facility ownership or operation, or other business entity, and (b) which has entered into a management or administrative services agreement or similar arrangement with the Company or any Subsidiary of the Company, or is required or is permitted under GAAP to be consolidated by the Company into its financial statements.

"Warrant EBITDA Price" means, with respect to each Investor Warrant, the proceeds to which such Investor Warrant would be entitled in connection with a sale for cash at a purchase price equal to 15.0x Adjusted EBITDA on a trailing twelve-month basis as of the time of the relevant determination; provided, that, for purposes of this definition, in no event shall such Adjusted EBITDA be less than the Adjusted EBITDA for the trailing twelve months set forth in the Company's compliance certificate most recently delivered to its senior lenders as of the time of the relevant determination.

or other purchasers of such Available Securities may elect to deposit the consideration representing the purchase price of the Available Securities with the Company's attorney (or any other third party, including a bank or a financial institution), as escrow holder. In the event of the foregoing election: (a) such Available Securities shall be deemed for all purposes (including the right to receive distributions) to have been transferred to the purchasers thereof; (b) to the extent that such Available Securities are evidenced by certificates, such certificates shall be deemed canceled and the Company shall issue new certificates in the name of the purchasers thereof; (c) the Company shall make an appropriate notation in its records to reflect the transfer of such Available Securities to the purchasers thereof; and (d) the Person obligated to sell such Available Securities shall merely be a creditor with respect to such Available Securities with the right only to receive payment of the purchase price, without interest, from the escrow funds. If, following the third (3rd) anniversary of the scheduled closing date for the purchase pursuant to this Article IX, the proceeds of sale have not been claimed by such Common Member or other seller of the Available Securities, the escrow deposit (and any interest earned thereon) shall, subject to the application of any applicable escheat laws, be returned to the Person originally depositing the same, and the transferors whose Available Securities were so purchased shall look solely to the purchasers thereof for payment of the purchase price (subject to reduction for any payments made pursuant to any applicable escheat laws). The escrowee shall not be liable for any action or inaction taken by it in good faith.

Section 9.4.    Manner of Payment. Notwithstanding anything to the contrary contained herein, the Company or a Subsidiary thereof may pay any portion of the Repurchase Price through the issuance of promissory notes with terms and conditions substantially similar to those contained in a Redemption Note, as provided in Section 8.1(b).

Section 9.5.    Change of Control Look-back. In the event the Company consummates a Change of Control within twelve (12) months of exercising a Repurchase Option, the Common Member from whom Available Securities were repurchased under such Repurchase Option shall be entitled to receive from the Company an additional amount (a "Look-back Amount") equal to the excess, if any, of (a) the consideration such Common Member would have been entitled to receive for such repurchased Available Securities as a result of such Change of Control if such Repurchase Option had not been exercised prior to the consummation of such Change of Control over (b) the Repurchase Price such Common Member received for such repurchased Available Securities. The Company shall pay, or caused to be paid, any Look-back Amount to the repurchased Common Member at the same time, in the same form(s), and on the same terms and conditions as such Common Member would have received such consideration if such Repurchase Option had not been exercised prior to the consummation of such Change of Control. This Section 9.5 shall not apply in the event the Repurchase Option was exercised by the Company following a Termination by the Company for Cause.

## ARTICLE X.
## CONFIDENTIALITY; RESTRICTIVE COVENANTS

Section 10.1.    Confidential Information.

(a)    No Member shall use at any time any Confidential Information of which such Member is or becomes aware except in connection with its investment in the Company (except that Members who are Directors, directors, officers or employees of the

Company or its Subsidiaries shall also be permitted to use such Confidential Information in connection with the performance of their duties as Directors, directors, officers or employees); provided, that this Section 10.1 is not intended to, and shall not, restrict the use by a Member of general skills, general industry knowledge or expertise acquired by such Member.

(b)     Each Member shall also keep the Confidential Information strictly confidential and shall not disclose it or cause or permit its Agents to disclose it, except (i) as required by applicable law, regulation or legal process or in response to any inquiry from a governmental entity or regulatory authority having jurisdiction over such Member, and only after compliance with Section 10.1(c), (ii) that it may disclose the Confidential Information or portions thereof to those of its Affiliates and its and their respective members, managers, officers, employees, directors, partners, advisors and other agents (such Persons being referred to as "Agents") who need to know such information in connection with the investment by such Member in the Company; provided that such Agents (x) are informed of the confidential and proprietary nature of the Confidential Information and (y) have agreed to maintain the confidentiality of the Confidential Information in a manner consistent with the provisions of this Article X and (iii) that it may disclose Confidential Information in connection with the enforcement of its rights under this Agreement or any other written agreement between it and the Company; provided, that it shall not oppose any action by the Company to obtain a protective order in any legal proceeding related thereto.  Notwithstanding anything herein to the contrary, each such Member and each Agent thereof may disclose to any and all Persons, without limitation of any kind, the tax treatment, tax structure or tax strategies of, and the tax strategies relating to, the Company and the transactions entered into by the Company and all materials of any kind (including opinions and other tax analyses) that are provided to such Member or Agent relating to such tax treatment, tax structure, or tax strategies.

(c)     If any such Member or Agent thereof becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, such Member or Agent thereof shall provide the Company with prompt and, if possible, prior written notice of such requirement to disclose such Confidential Information.  Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, such Member and its Agents shall disclose only that portion of the Confidential Information which is legally required to be disclosed (as determined in good faith by counsel to such Member) and shall take all reasonable steps to preserve the confidentiality of the Confidential Information.  In addition, neither such Member nor its Agents shall oppose any action (and such Member and its Agents shall, if and to the extent requested by the Company and legally permissible to do so, cooperate with and assist the Company, at the Company's expense and on a reasonable basis, in any reasonable action) by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded the Confidential Information.

Section 10.2.     Management Member Restrictive Covenants.

(a)     Each Management Member understands and acknowledges that, subject to any written contractual agreement to the contrary, such Management Member's

-54-

employment or service to the Company may be terminated by the Company, with or without Cause, and with or without notice, at any time, at the option of the Board.

(b)    Subject to Section 10.2(c) and Section 10.2(d), each Management Member agrees:

(i)    During such Management Member's Employment Relationship, not to directly or indirectly, as an officer, director, employee, independent contractor, or equity owner of any other corporation, partnership or other organization, engage in any Competing Business;

(ii)    For a period of two (2) years from and after such Management Member's Termination (the "Restricted Period"), within a 25 air-mile radius of any hospital or other veterinary facility owned or operated by the Company or any of its Affiliates during such Management Member's Employment Relationship at which such Management Member worked more than 26 days in any 12-month period, or at least six days in any three-month period (collectively, the "Geographic Area"), not to engage in any capacity, directly or indirectly, in a Competing Business; provided, that so long as such Management Member's medical practice is conducted entirely outside of the Geographic Area, such Management Member will be permitted to receive referrals from Referral Partners located within the Geographic Area and to treat patients of Clients located within the Geographic Area, provided further, that such Management Member has not Solicited such business, and provided further, that notwithstanding any provision contained herein to the contrary, nothing in this Agreement or in any other agreement with the Company and/or its Affiliates shall prevent a Management Member from providing consulting work for laboratories or for research entities and/or organizations;

(iii)    During such Management Member's Employment Relationship and the Restricted Period, not to directly or indirectly: (A) dissuade Clients or Referral Partners from utilizing the services of the Company or any of its Affiliates; or, (B) Solicit or otherwise divert or interfere with business relationships between the Company or any of its Affiliates and any Client, Referral Partner, supplier, vendor or independent contractor, or attempt to assist any third party in doing so, provided, that none of the restrictions in this Section 10.2(b)(iii) shall restricted such Management Member using his or her best professional judgment in a given situation; and

(iv)    During such Management Member's Employment Relationship and the Restricted Period, not to directly or indirectly, recruit or solicit employment of any employee or agent of the Company or any of its Affiliates, or of any person who had been an employee or agent of the Company or any of its Affiliates during such Management Member's Employment Relationship and whose employment or agency terminated within the previous three months, or otherwise induce such employee or agent to leave the employment or agency of the Company or any of its Affiliates, to become an employee or agent of or otherwise be associated with such Management Member or any company or business with which such Management Member is or may become associated.

-55-

(c)     Notwithstanding the provisions of this <u>Article X</u>, if any Management Member is a party to any agreement with the Company or any Subsidiary the terms of which govern issues and obligations which are identical or substantially similar to those addressed in these foregoing sections (any such terms, "<u>Conflicting Terms</u>"), the Conflicting Terms will supersede the provisions in these foregoing sections for all purposes and <u>Section 10.2</u> will not apply with respect to such Member for so long as such Conflicting Terms are in effect with respect to such Management Member, but <u>Section 10.2</u> shall apply to such Member from and after the time any such Conflicting Terms are no longer in effect with respect to such Management Member.

<u>Section 10.3.</u>     <u>Entity Member Restrictive Covenants.</u>

(a)     On and from July 15, 2019, each Entity Member, and upon admission any Entity Member admitted after July 15, 2019, shall identify to the Board each holder of any Equity Securities of such Entity Member and shall upon request of the Board at any time thereafter confirm the holders of any Equity Securities of such Entity Member.

(b)     Each Entity Member shall provide prompt (and in any event within thirty (30) days of occurrence) written notice to the Board of:

(i)     the occurrence of any bankruptcy, liquidation or winding up of such Entity Member or the commencement of any proceedings with respect thereto; and

(ii)     the occurrence of any of the following events with respect to any holder of any Equity Securities of such Entity Member: retirement, resignation, expulsion, bankruptcy, death, incapacity or disability, or the commencement of any proceedings with respect thereto.

(c)     No Entity Member shall issue any Equity Securities without the prior, written consent of the Board.

(d)     No Entity Member shall permit any holder of any of its Equity Securities to Transfer any of such Entity's Equity Securities without the prior, written consent of the Board.

(e)     Each Entity Member shall prohibit the holders of any of its Equity Securities from granting any lien, security interest or other encumbrance upon any of the Equity Securities of such Entity Member.

(f)     No Entity Member shall enter into any of the following transactions without the prior, written consent of the Board: (i) a merger or consolidation of such Entity Member, or a sale, exchange, conveyance or other disposition of such Equity Member's Equity Securities, in a single transaction or a series of related transactions, as a result of which the equity holders of the Entity Member immediately prior to such merger, consolidation, sale, exchange, conveyance or other disposition (determined at the time of the first of such series of transactions) beneficially own less than a majority (determined by reference to voting as well as economic rights) of such Entity Member's or any successor entity's issued and outstanding Equity Securities immediately after such merger, consolidation, sale, exchange, conveyance or other disposition or series of such transactions; or (ii) a single transaction or series of related transactions pursuant to which any Person acquires all or substantially all of such Entity Member's assets determined on

-56-

a consolidated basis, including through the purchase of Equity Securities of one or more Subsidiaries of such Entity Member.

Section 10.4.    Freedom to Pursue Opportunities.

(a)    The parties expressly acknowledge and agree that: (i) each of the Broad Street Investor, its Affiliates and associated funds, and each of the SkyKnight Member and its Affiliates have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly engage in the same or similar business activities or lines of business as the Company or any of its Subsidiaries, on its own account, or in partnership with, or as an employee, officer, director or stockholder of any other Person, including those lines of business deemed to be competing with the Company or any of its Subsidiaries; (ii) none of the Company, any of its Subsidiaries or any Member shall have any rights in and to the business ventures of the Broad Street Investor or any of its Affiliates and associated funds, or the SkyKnight Member or any of its Affiliates, or the income or profits derived therefrom; (iii) each of the Broad Street Investor and its Affiliates and associated funds, and each of the SkyKnight Member and its Affiliates may do business with any potential or actual customer or supplier of the Company or any of its Subsidiaries or may employ or otherwise engage any officer or employee of the Company or any of its Subsidiaries; and (iv) in the event that the Broad Street Investor or any of its Affiliates or associated funds, or the SkyKnight Member or any of its Affiliates acquires knowledge of a potential transaction or matter that may be an opportunity for the Company, such Person shall have no fiduciary duty or other duty (contractual or otherwise) to communicate or present such opportunity to the Company, any of its Subsidiaries, any other Member, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company, any of its Subsidiaries or any other Member (and their respective Affiliates) for breach of any fiduciary duty or other duty (contractual or otherwise) by reason of the fact that the Broad Street Investor, such Affiliate or associated fund, or the SkyKnight Member or its Affiliates, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company, any of its Subsidiaries, or any other Member.

(b)    Each Member (for itself and on behalf of the Company) hereby, to the fullest extent permitted by applicable law, acknowledges and agrees that, (i) in the event of any conflict of interest between the Company or any of its Subsidiaries, on the one hand, and the Broad Street Investor or any of its Affiliates or the SkyKnight Member or any of its Affiliates, on the other hand, each of the Broad Street Investor and its Affiliates and each of the SkyKnight Member and its Affiliates may act in its best interest, and (ii) the Broad Street Investor and its Affiliates and the SkyKnight Member and its Affiliates shall not be obligated (A) to reveal to the Company or any of its Subsidiaries confidential information belonging to or relating to the business of the Broad Street Investor and its Affiliates or the SkyKnight Member and its Affiliates or (B) to recommend or take any action in its capacity as the Broad Street Investor or such Affiliate or the SkyKnight Member or such Affiliate that prefers the interest of the Company or any of its Subsidiaries over the interest of the Broad Street Investor or any of its Affiliates or the SkyKnight Member or any of its Affiliates.

local license or permit needed to operate its business or the business of any entity in which the Company invests.

### ARTICLE XIV.
### MISCELLANEOUS

Section 14.1.  Schedules.  Without in any way limiting the provisions of Sections 4.6 and 11.2, a Director may from time to time execute on behalf of the Company and deliver to the Members schedules which set forth the then current Capital Account balances of each Member and any other matters deemed appropriate by the Board or required by applicable law.  Such schedules shall be for information purposes only and shall not be deemed to be part of this Agreement for any purpose whatsoever.

Section 14.2.  Specified Member.

(a)      Each Preferred Member and each Investor Warrant Holder, by virtue of the execution of this Agreement, hereby irrevocably appoints BSPI or its designee (the "Specified Member") as the attorney-in-fact and proxy of such Preferred Member and such Investor Warrant Holder with full power of substitution, to vote, provide a written consent or take any other action with respect to its Preferred Units (including with respect to the giving or withholding of Preferred Member Approval), Investor Warrants and Common Units issued as a result of the Investor Warrants.  Such proxy shall be irrevocable and coupled with an interest, and each such Person shall take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy.  For the avoidance of doubt, all actions with respect to the Class A Preferred Units, the Investor Warrants and the Common Units issued as a result of the Investor Warrants will be taken or exercised by the Specified Member and not the holder thereof.

(b)      Neither the Specified Member nor the Company or any of its Affiliates shall be liable to any Preferred Member or Investor Warrant Holder for any act done or omitted hereunder by the Specified Member in such capacity.  The Preferred Members shall severally indemnify the Specified Member, in proportion to their respective holdings of Preferred Units and hold the Specified Member harmless against any loss, liability, damage, claim, suit, penalty, cost or expense (including fees and expenses of counsel) incurred without gross negligence, fraud or bad faith on the part of the Specified Member and arising out of or in connection with the acceptance or administration of its duties hereunder.

Section 14.3.  Governing Law.   THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF OHIO, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any provision of the Articles or any mandatory provision of the Act, the applicable provision of the Articles or the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

-63-

Section 14.10. Jurisdiction.   Except as expressly provided below, any suit, action or proceeding under or with respect to this Agreement, or any judgment entered by any court in respect of any thereof, shall be brought in any court of competent jurisdiction in the State of Ohio and each of the Company and the Members hereby submits to the exclusive jurisdiction of the courts in Franklin County, Ohio for the purpose of any such suit, action, proceeding or judgment.   Each of the Company and the Members hereby irrevocably waives any objections which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court of competent jurisdiction in Franklin County, Ohio, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum.

**[Remainder of page intentionally left blank]**

-66-

CO\6335535.5